**FILED**

AO 106 (Rev. 04/10)  Application for a Search Warrant

UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

DEC 0 7 2015

MATTHEW J. DYKMAN
CLERK

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

224 Atrisco Vista Boulevard SW Trailer #614,
Albuquerque, NM 87121

)
)
)
)
)
)

Case No.    15mr808

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment C

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21 841(a)(1) and 846 | Possession with Intent to Distribute and Conspiracy |
| Title 21 924(c) | Use or Carrying a Firearm During Drug Trafficking |

The application is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Julie Olmsted, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 12/7/15

City and state:  Albuquerque, NM

*Judge's signature*

United States Magistrate Judge Steven C. Yarbrough
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Julie A. Olmsted, being duly sworn, depose and state as follows:

### INTRODUCTION

1.      I am a Special Agent of the Drug Enforcement Administration (DEA), United States Department of Justice.  I have been a Special Agent since January 2012 and I am currently assigned to the Albuquerque District Office.   My experience as a Special Agent includes, but is not limited to, conducting surveillance, interviewing witnesses, debriefing defendants, writing affidavits for and executing search warrants, and working with undercover agents and informants.  I have received training in and have experience in the investigation of violations of the federal drug and money laundering laws, including the offenses listed below.  I have participated in the investigation of numerous drug trafficking conspiracies, including several Title III investigations.  As a result, I am, and agents assisting in this investigation, are familiar with matters including, but not limited to, the means and methods used by persons and drug trafficking organizations ("DTOs") to purchase, transport, store, and distribute drugs and to hide profits generated from those transactions.  I also have experience in analyzing and interpreting drug codes and cryptic dialogue used by drug traffickers.  I am aware that DTOs are concerned about the efforts law enforcement make to disrupt and dismantle their activities.

2.      I am an investigator assigned to the investigation of a Drug Trafficking Organization ("DTO") that operates in and around Albuquerque, New Mexico.  The investigation of the DTO focused on individuals that acquired, stored, prepared, packaged, and sold methamphetamine and heroin in Albuquerque, New Mexico.

3.      I make this affidavit based upon my own personal knowledge, which is substantially derived from my participation in the investigation, as well as that of fellow agents and officers

1

who have participated in the investigation. In addition, I have developed information I believe to be reliable from additional sources including:

     a. Information provided by Task Force Officers ("TFO") and Special Agents ("SA") of the DEA, Senior Financial Investigators and other law enforcement officials ("agents"), including oral and written reports that I have received directly or indirectly from said investigators;

     b. Results of physical surveillance conducted by agents during the investigation;

     c. Information provided by reliable Source of Information ("SOI");

     d. Information provided by undercover agents;

     e. A review of telephone toll records and subscriber information;

     f. Information derived from consensually recorded conversations;

     g. Information derived from lawfully intercepted telephone conversations;

     h. A review of driver's license and automobile registration records; and

     i. Records from the National Crime Information Center ("NCIC").

4.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search certain premises. This affidavit is intended to show only that there is sufficient probable cause for the requested search warrant located at 224 Atrisco Vista Boulevard Trailer #614, Albuquerque, New Mexico 87121 ("BUSTILLOS' HOUSE") and does not set forth all of my knowledge about this matter. Additionally, agents expect that BUSTILLOS' HOUSE has been used and continues to be used by Ruben Bustillos-Pacheco and Ruben Pacheco-Soto ("SUBJECTS").

### FEDERAL CHARGES RELEVANT TO THIS INVESTIGATION

5.    I believe there is probable cause that the SUBJECTS have committed, are committing,

and will continue to commit offenses involving violations of, *inter alia*:

      a.  21 U.S.C. § 841 – Possession with intent to distribute and distribution of a controlled substance, namely methamphetamine and heroin;

      b.  21 U.S.C. § 843(b) – Use of a communication facility to further the commission of a felony controlled substance offense;

      c.  21 U.S.C. § 846 – Conspiracy to possess with intent to distribute and to distribute controlled substances;

      d.  21 U.S.C. § 856 – Maintaining a place for manufacture, distribution, or use of controlled substances;

      e.  21 U.S.C. §§ 952(a), 960(a), 963 – Conspiracy to import and importation of controlled substances;

      f.  18 U.S.C. § 924(c) – Possess/Carry a firearm in connection with drug trafficking crime;

      g.  18 U.S.C § 1957 – engaging in monetary transactions involving property derived from specified unlawful activity, and;

      h.  18 U.S.C. § 2 – Aiding and abetting.

## EVIDENCE SOUGHT DURING SEARCH

6.     Based on my training, experience and participation in this and in similar investigations, I believe that, individuals involved in illegal trafficking of controlled substances often conceal evidence of their drug trafficking in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports and outbuildings. They also conceal evidence in vehicles, including vehicles outside of their residences, so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences or businesses. Evidence also may be found in other areas to which a drug dealer has ready access, such as rented storage areas and safety deposit boxes, or buried underground on their property. This evidence which is discussed in detail in the following paragraphs, including paraphernalia for

3

weighing, packaging and distributing drugs, other contraband, records, documents, and evidence of drug transactions, proceeds from drug sales, and valuables obtained from proceeds. All such records as described in the paragraphs below can also be produced and/or stored on computers and other computer-related digital media such as a computer hard drive, external hard drives, thumb drives, secure digital cards and other types of flash memory cards, compact disks and floppy disks, personal digital assistants (PDAs), BlackBerry devices, iPhones, iPods, iPads, digital cameras and cellular telephones.

7.      Individuals involved in illegal drug trafficking of controlled substances often keep quantities of controlled substances on their person, in their residences, garages, outbuildings, storage areas, carports and yards, in their businesses, in the residences of friends or relatives, in their vehicles, in off-site storage facilities, and in other areas to which they have ready access.

8.      Individuals involved in drug dealing commonly use certain paraphernalia to package and prepare controlled substances for distribution. The paraphernalia includes, but is not limited to, packaging materials (such as plastic baggies, wrapping paper, cellophane, condoms, and film canisters) and scales to weigh controlled substances. Drug dealers commonly store these items on their person, in their residences, in their businesses, in the residences of friends or relatives, in their vehicles, and in other areas to which they have ready access.

9.      Drug traffickers often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators. These records may be maintained on paper, in the form of business and personal ledgers and diaries, calendars,

4

memoranda, pay/owe sheets, IOUs, miscellaneous notes, money orders, customer lists and telephone address books. These records can reflect names, addresses and/or telephone numbers of associates and co-conspirators, the sale and purchase of controlled substances including precursors, customer lists and amounts of money owed to the trafficker by customers and by the trafficker to his/her suppliers.

10.     Drug traffickers often travel domestically and internationally to facilitate their trafficking. Evidence of foreign and domestic travel by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, receipts, and passports and visas and their contents.  These items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of relatives and in cars.  Many of these items are accessible via the internet and can be downloaded and saved on the computer or other media.

11.     Drug traffickers often use storage facilities for drugs and other items related to trafficking that are at a location away from their residences and businesses.  These off-site storage facilities are often commercial storage lockers and rooms.  These locations are often used to store or hide drugs, contraband, money and other valuables.  Drug traffickers often keep documents and other items tending to show the existence of other stored drugs, contraband, money and other valuables in areas such as storage facilities.  Those documents and other items include rental agreements, receipts, keys, notes and maps specifically concerning off-site storage rooms, lockers, and safety deposit boxes.  This evidence may be found on their person or in their businesses, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars.  This type of documentation can be stored on digital media and concealed virtually anywhere.

12.     Other evidence of transportation, ordering, possession and sale of drugs can include the following: telephone bills to show numbers called by the drug dealers (and hence potential associates), overnight mail receipts, bank statements, deposit and withdrawal slips, savings books, investment statements, loan statements, other financial institution statements, and federal and state tax returns. The above items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars. This type of documentation can be stored on digital media and concealed virtually anywhere.

13.     Drug traffickers usually sell their product for cash. Because large quantities of drugs can sell for thousands of dollars even at the wholesale level, dealers typically may have thousands of dollars in cash on hand both as proceeds of sales and to purchase supplies/inventory. In addition, drug dealers often have other assets generated by their drug business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles and other valuables.

14.     Individuals involved in drug dealing often try to legitimize these profits from the sale of drugs. To accomplish these goals, drug traffickers utilize foreign and/or domestic banking institutions and their attendant services, real estate and businesses, both real and fictitious. They also try to secret, transfer and conceal the money by (a) placing assets in names other than their own to avoid detection while maintaining control, (b) laundering money through what appears to be a legitimate business or businesses, (c) hiding the money in their homes, safes and safety deposit boxes, and/or (d) using the money to buy assets which are difficult to trace. This evidence is useful in a criminal prosecution, and it also is useful in identifying real and personal property that can be seized and forfeited by the government under existing laws. Documentation concerning this type of activity can be stored on digital media and concealed virtually anywhere.

6

15.    Evidence of significant, unexplained income of drug dealers, or for the acquisition and concealment of money and assets of drug sales, can be found on banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and canceled mail.  These records can be maintained on paper, but also can be maintained as electronic data on computers and other digital media.  The above items are typically kept by drug dealers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and cars.

16.    Drug traffickers typically use telephones, pagers, two-way radio systems, fax machines, other communication systems, many of which can be accessed and controlled by computers or otherwise be communicated with by computers, counter-surveillance devices such as police radio scanners, and related devices in their drug trafficking activities.  These items are stored by drug dealers on their person or in their businesses, residences or cars, or the residences of friends or relatives.

17.    Information stored in electronic form on all of the above devices can provide evidence of drug trafficking and the identity of associates.  For example, numbers stored in the telephones (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the drug dealer is calling, and thus the identity of potential associates.  Pagers, cellular telephones

7

and other communication devices can contain similar information. Also, logs from fax machines can be evidence of messages sent and received, and the corresponding telephone numbers of possible associates and co-conspirators.

18.     Drug traffickers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property and their drugs. They usually maintain these photographs and/or videos on their person or in their businesses, residences or cars, on computers, or in the residences of friends or relatives. Digital still and video cameras are becoming commonplace and may be used to record digital photographs or videos. Scanners may be utilized to convert older format photographs to digital format, and magnetic video can be transferred to digital format. All can be stored in computer hard drives and related digital media.

19.     Drug traffickers often maintain firearms and ammunition on their person or in their homes, businesses or cars to protect themselves and their drugs and their drug profits. They also may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, firearms cleaning supplies, and instruction manuals and other documentation for firearms and ammunition.

20.     I know that weapons (including rifles, shotguns, and handguns) are tools of the trade for drug traffickers, who often keep firearms in close proximity to themselves, and their product and proceeds, to protect them from other drug traffickers and law enforcement.

21.     Drug traffickers often conceal evidence of drug dealing in vehicles outside of their residences for ready access and to prevent detection and seizure by officers executing search warrants at their residences. This evidence, which is discussed in detail in the preceding paragraphs, includes controlled substances, indicia such as packing documents and electronic storage devices (and their contents,) evidence tending to show the distribution of drugs (such as

8

IOUs, pay-owe sheets, ledgers, lists of names and numbers, telephone address books, etc.),
digital pagers (and their contents) cellular/mobile telephones (and their contents), and counter-
surveillance devices.

22.     Documents showing who owns, occupies or controls the location being searched also
show who is responsible for the items found on the premises, including contraband and other
evidence seized. Documents and items showing the identity of the persons owning, residing in
or controlling the area being searched include, but are not limited to, utility and telephone bills,
canceled envelopes and correspondence, outgoing answering machine messages, tax returns,
keys, deeds and mortgage receipts. These documents may also be produced on computers,
downloaded from online accounts or scanned into digital format and stored on computers and
related digital media.

23.     A list of items agents seek authority to seize is in Attachment B.

## BACKGROUND OF INVESTIGATION

24.     This investigation began in May 2014, when DEA agents received information that
Guillermo Rivas-Recendiz, also known as "Junior" ("Junior"), was a methamphetamine
distributor operating in Chihuahua, Mexico and distributing methamphetamine into New Mexico
and throughout the United States. From June 2014 to January 2015, an undercover agent ("UC")
purchased bulk quantities of methamphetamine from Junior. During these purchases, Junior
provided the methamphetamine to the UC initially without cost, after which the UC made
payments to individuals and bank accounts at Junior's direction.

25.     During one of the UC purchases, in August 2014, Junior directed Esther Ordonez
("Esther") to provide a half pound of methamphetamine to the UC. On this same date, the UC
met with Esther, who provided approximately 250.1 grams of methamphetamine to the UC in

9

Albuquerque, New Mexico. The UC and Junior, again, negotiated for payment of $3,000 to be made at a later date. The UC later provided payment to Esther on September 3, 2014, in Albuquerque, New Mexico, at Junior's direction. During this meeting, agents identified the residence of Esther at 2620 Katrina Drive SW, Albuquerque, New Mexico 87121 ("ORDONEZ' HOUSE").

26.     Also during these UC heroin purchases and surveillance operations, agents identified another suspected 'stash' house associated with the Ordonez DTO, located at 1243 Amole Vista Street SW, Albuquerque, New Mexico 87121 ("AMOLE VISTA HOUSE"). AMOLE VISTA HOUSE is also referenced below during the UC heroin purchases.

27.     In September and October of 2014 and in January of 2015, the UC purchased methamphetamine from Junior through Esther in Albuquerque, New Mexico. On November 10, 2014, the UC met with Esther in order to provide Esther partial payment of $1,000 for methamphetamine that was previously "fronted" to the UC from Junior. During this meeting, Esther asked the UC if the UC knew any individuals in Santa Fe who wanted heroin. The UC advised Esther that the UC knew people in Santa Fe and wanted heroin to show them. Esther stated she had one ounce of heroin with her. The UC then purchased approximately 24.2 grams of heroin from Esther for $760. Also during this meeting, Esther stated she obtained her heroin from a 22 year old Mexican, from Sinaloa, that is in the country illegally, who agents later identified as Gonzalo Montenegro-Coronel ("Gonzalo").

28.     From December of 2014 to September of 2015, agents conducted multiple UC heroin purchases from Esther, Miguel Ordonez ("Miguel") and Reydecel Lopez-Ordonez ("Reydecel") in Albuquerque, New Mexico.

29.     During these UC purchases, agents began court authorized wire and electronic

interceptions over Esther's cellular telephone ("ORDONEZ PHONE 1").  Agents subsequently

intercepted communications over the phone used by Esther's Albuquerque heroin SOS, Gonzalo

("GONZALO PHONE 1 and GONZALO PHONE 2").

30.     During interception over GONZALO PHONE 2, on June 26, 2015, an unidentified male

("UM77") advised Gonzalo that someone who lives near Gonzalo would contact him to collect

money.  Later that day, Gonzalo received a phone call from Ruben Pacheco-Soto ("Pacheco"),

who stated he was Aron' friend.  The call disconnected in the middle of the conversation.  Later,

Gonzalo received an incoming call from Pacheco, who stated that the "old guy" sent him.  I

believe Pacheco was referring to UM77, or another command figure in Mexico, for whom

Pacheco was going to collect illegal drug costs.  Therefore, agents conducted surveillance of

Gonzalo at ORDONEZ' HOUSE where they observed a black Chrysler 300, used by Eduardo

Munoz-Salcido ("Munoz"), arrive at ORDONEZ' HOUSE.  Afterwards, agents watched

Gonzalo enter Munoz' vehicle. Agents observed Munoz' black Chrysler 300 travel to AMOLE

VISTA HOUSE and shortly after depart and travel to the Walmart parking lot where Gonzalo

and Pacheco agreed to meet.  There, Gonzalo met with Pacheco at Pacheco's truck before

Gonzalo re-entered Munoz' Chrysler 300.  During this meeting, I believe Gonzalo provided

illegal drug proceeds that were stored at ORDONEZ' HOUSE to Pacheco in exchange for illegal

drugs.  Based on the investigation to date, agents believe that UM77 directs Gonzalo to provide

money to one of UM77's connections in Albuquerque, after which an illegal drug shipment will

arrive for Gonzalo within several days.  For example, on April 26, 2015, UM77 directed Gonzalo

to provide money to an individual who would contact Gonzalo.  After this phone call, agents

observed Gonzalo meet with the driver of a green Jeep Commander, at a gas station, during

which they appeared to make an exchange.  Two days later, UM77 told Gonzalo that someone

would be contacting Gonzalo regarding the drug shipment.  Later that day, Gonzalo received phone calls from Luis Escapite ("Escapite") and Fernando Gomez-Campos ("Gomez"), advising that they were in Albuquerque, New Mexico and needed to meet with Gonzalo.  Agents observed Escapite and Gomez traveling in a white Volkswagen Jetta.  Agents observed Gonzalo meet with Gomez and obtain an unknown amount of heroin from Gomez.

31.     The payment and subsequent drug shipment scenario happened again from May 15, 2015, and May 18, 2015.  On May 15, 2015, agents observed Gonzalo meet with the driver of the same green Jeep Commander and make an exchange with the driver.  During this meeting, agents believe Gonzalo paid the driver of the Jeep for a future drug shipment.  On May 18, 2015, agents observed Gonzalo meet with Escapite, who was the driver of the same white Volkswagen Jetta during which Escapite appeared to provide an unknown amount of illegal drugs to Gonzalo.

32.     On July 29, 2015, agents initiated court authorized interceptions over Gonzalo's new cellular telephone number ("GONZALO PHONE 3") and a cellular telephone utilized by Pacheco ("UM1505 PHONE").

33.     On August 1, 2015, agents intercepted a phone call between Pacheco and Bustillos.  During this call, Bustillos advised Pacheco that Pacheco had to go to Las Vegas tomorrow because "this guy" just called Bustillos, to which Pacheco agreed.  Later that evening, Pacheco called Bustillos and asked Bustillos if "it" (illegal drugs) would be "two," and Bustillos affirmed.  Pacheco advised that Pacheco would go "there" (BUSTILLOS' HOUSE) and get the "dinner" (illegal drugs) ready, to which Bustillos agreed.  Based on a court authorized location warrant for UM1505 PHONE, agents were able to map Pacheco traveling north bound on Interstate 25 at approximately 9:22 a.m. on August 2, 2015.  At approximately 11:43 a.m., Pacheco called Bustillos and told Bustillos that he had arrived, after which Bustillos told Pacheco to wait.

Approximately one minute later, Bustillos called Pacheco and asked what vehicle Pacheco was in, to which Pacheco responded the "red one," which agents know to be a red Chevrolet Tahoe. Approximately five minutes later, Pacheco advised Bustillos that he was arriving at the store now, and Bustillos told Pacheco that "they" (later identified as Stephen Tapia-Munoz) were in a blue car. Based on GPS location data for UM1505 PHONE, Pacheco was at the rue21 parking lot located 2500 7th St., Las Vegas, New Mexico 87701. Approximately fifteen minutes later, Pacheco was south bound on Interstate 25. Based on this meeting, I believe Bustillos directed Pacheco to travel to Las Vegas, New Mexico in order to provide approximately two kilograms of illegal drugs to Stephen Tapia-Munoz ("Tapia").

34.     On August 12, 2015, agents intercepted a phone call between Pacheco and an unidentified male ("UM69"), during which UM69 directed Pacheco to "call the guy" (Gonzalo) so that Gonzalo could give Pacheco "four pesos" for the "taxi" (driver transporting the illegal drugs), to which Pacheco agreed. On August 13, 2015, during intercepted phone calls between Gonzalo and Pacheco, Gonzalo agreed to provide Pacheco the "receipts" (illegal drugs proceeds) for the "taxi." On August 14, 2015, agents intercepted a phone call between Gonzalo and Pacheco during which Gonzalo told Pacheco that Gonzalo was at PACHECO'S HOUSE. I believe during this meeting, Gonzalo provided money for illegal drugs to Pacheco. On August 16, 2015, agents intercepted a phone call between Pacheco and Julio Cesar Ramon Delgado-Becerra ("Delgado"), where Delgado advised Pacheco that he was traveling past Truth or Consequences, New Mexico. Both agreed to meet at the Burger King restaurant located off of Interstate 25 and Gibson. Agents observed Pacheco meet with Delgado in Albuquerque, New Mexico and Delgado remove a medium sized bag from the back seat of Delgado vehicle and enter into the passenger side seat of the Pacheco's vehicle. Based on these intercepted phone

calls and surveillance operations, I believe UM69 is Pacheco's SOS operating in Mexico. Based on the intercepted phone calls that coincide with one another between Gonzalo and UM77 and Pacheco and UM69. Agents believed UM77 and UM69 are working with one another in Mexico in order to further their drug trafficking organization.

## AUGUST 13, 2015

35.     On August 13, 2015, agents intercepted a phone call between Pacheco and Bustillos. During this call, Bustillos asked Pacheco if he wanted to go to Las Vegas tomorrow and Pacheco agreed. Bustillos then asked Pacheco "are there still clean curtains?" which agents believe meant uncut illegal drugs. Pacheco advised that there was a little bit left as well as a "sheet." Pacheco continued to say that there was "one and a bit. There's….there's like two" and that he would add eighteen (18) parts (of a cutting agent) to forty-eight (48) parts (of the illegal drugs). Bustillos told Pacheco to bring "it" (illegal drugs) over "here" (Bustillos house) because "he wants it like that, um…the way it comes out" (the customer in Las Vegas, New Mexico). Bustillos advised Pacheco to add the "curtains" (cutting agent) to the "window" and measure it well and Pacheco agreed to do so. Then on August 13, 2015, agents observed Pacheco leave PACHECO'S HOUSE, from which Pacheco travelled to BUSTILLOS' HOUSE. There, agents observed Bustillos enter into Pacheco's vehicle. Agents observed Pacheco's vehicle then travel to the Presbyterian Rust Medical Center and approximately five minutes later leave the Center and travel directly to Raton, [Las Vegas] New Mexico and meet with Stephen Tapia-Munoz ("Tapia"). Agents observed Tapia exit from his vehicle and enter into the back passenger seat of Pacheco's vehicle. Approximately two minutes later, Tapia exited from Pacheco's vehicle and entered into his vehicle. Agents observed Tapia and an unidentified female, later to be identified as Demi Trujillo ("Trujillo"), travel to 700 Washington Street Space D3, Raton, New Mexico. During

this meeting, I believe Pacheco and Bustillos provided heroin, likely two kilograms, to Tapia,

who then traveled to Raton, New Mexico.  During the transit to Raton, Trujillo drove and Tapia

was the passenger.  During a traffic stop at DEA's request, Tapia appeared extremely nervous.

Trujillo denied consent to search and they were let go.

36.     On September 17, 2015, agents initiated court authorized wire and electronic

interceptions over Pacheco's cellular telephone (UM1505 PHONE 1 and 2) and a telephone used

by Bustillos ("BUSTILLOS PHONE 1").

37.     On October 4, 2015, agents intercepted electronic and wire communications between

Bustillos and a male who responded to the moniker, "Puppet."  During the conversations, Puppet

asked Bustillos if Bustillos was "working with the same shit" that Bustillos had in the past,

which Bustilllos affirmed.  Bustillos stated that he intended to contact Puppet because Bustillos

had just acquired some "new stuff."  Puppet told Bustillos that he was tired of all these "other

guys" who were playing games, and stated that Puppet had money and was not asking for any

"fronts" or "favors," but only for "quality," and good "work."  Puppet told Bustillos that he liked

Bustillos because Bustillos had "fire ass shit," that might be a little pricey but as long as Puppet

made his money back and both were satisfied, it was all good, which Bustillos affirmed.  Puppet

asked Bustillos what kind of prices Bustillos had, and Bustillos stated that he was at a restaurant

and would have to contact Puppet later.  During this conversation, I believe "Puppet" was asking

Bustillos if Bustillos was selling the same type of drugs, likely heroin that Bustillos was selling

before.  Bustillos affirmed, meaning that he was still selling the same type of heroin.  Bustillos

then stated that he meant to contact Puppet because Bustillos obtained some "new stuff," which I

interpreted to mean a different type or quality of heroin.  I believe after that, Puppet stated that he

was not looking for drugs to be given on loan, but rather, Puppet had funding and wanted to

acquire high quality drugs.  Puppet added that in his dealings with Bustillos, he found Bustillos'

supply to be more expensive, but added that it was an acceptable arrangement so long as it

remained profitable for both of them.  I believe Puppet then asked Bustillos the prices he was

offering, which typically would coincide with a quality or type of drug.  I believe that Bustillos

did not want to discuss specifics further due to Bustillos' presence in a restaurant.

38.     Shortly after this call, Bustillos and Puppet exchanged a series of text messages.  During

these text messages, Bustillos asked Puppet "How many you trying to grab so I can try work

something off," to which Puppet responded less than a minute later, "Wats the prices g[.]"

Bustillos replied, "I got 3 different 850 950 1,200." and also texted, "They are all good no lie i

hsve the bedt around right ow."  Bustillos then texted, "Let me know how many you trying to

grab I'll try work some out with u g."  Puppet texted Bustillos, "The ones 4 1200 how many can

u put into one o on the real g."  After discussions about quantity and quality, eventually Bustillos

responded, "I can get you I I'll give you 16 for 15" and added, "Its flame to no lie you'll have the

trap back jumpin."  Puppet then asked if he would be able to "…chop 1 in 3" and Bustillos said

"Easy."  Puppet advised that that was what he was looking for and that he and Bustillos could

make a lot of money together.  Puppet texted, "Its 25 a pop rite," to which Bustillos texted,

"Yeah g," which I interpreted to mean 25 grams per ounce, which is a common miscalculation of

grams to ounces sometimes referred to as a "Mexican ounce."  Puppet then texted, "…is it goin

to be packaged like not fuckd wit," after which Bustillos texted, "Yeah g I got you your gonna

like it I know it, your gonna cone back."  During these text messages, I believe Puppet was

asking about the price per quantity—likely per ounce—that Bustillos was seeking for different

qualities of heroin.  I believe that when Bustillos responded, "I got 3 different 850 950 1,200," he

was referring to the price per ounce of three different qualities of heroin.  I believe Bustillos then

offered 16 ounces of the highest priced-heroin for (the price of) 15. I believe that Puppet then verified that he could dilute the high quality heroin down into thirds, in an effort to promote his profit margin, and also confirmed whether an ounce consisted of 25 grams, where it is normally 28.5 grams. Bustillos confirmed both, and appeared to emphasize the high quality of his heroin throughout the communications.

39.     Puppet confirmed with Bustillos "Ight 15 racks," and "15 racks for a pound rite," to which Bustillos confirmed, "Yeah." Puppet advised that he got "it" and asked to check it out. Bustillos told Puppet "Yeah I gotta pick it up I'm I came to the casino after I ate but I'm already on the freeway I was just killing time," and Puppet asked where to meet Bustillos. Bustillos advised "the west gate g I'm pulling up to my crib," to which Puppet agreed. Puppet advised Bustillos to "Let me knw I dnt want to be caryin al this cash on me," and Bustillos advised he was "pulling up." During this exchange, I believe Puppet wanted to see the 16 ounces of heroin and wanted to minimize the time he spent carrying around its cost, which was thousands of dollars, likely in cash. Bustillos indicated that he was burning time at the casino but had to "pick it up," and was headed home, which indicated that he kept the heroin at BUSTILLOS HOUSE. Puppet asked for updates about Bustillos' whereabouts, to which Bustillos told Puppet to meet him at the "west gate," which is a gate surrounding the mobile home complex that BUSTILLOS HOUSE is within. Subsequent text messages indicate that they continued to coordinate a meeting at the west gate of the mobile home complex by BUSTILLOS HOUSE and that they eventually met near midnight.

40.     Agents also initiated a court authorized Global Positioning System Ping location over BUSTILLOS PHONE 1. Coinciding with the Bustillos' statements when he was near BUSTILLOS HOUSE, location data placed Bustillos at BUSTILLOS HOUSE. I believe this

verified that Bustillos already had at least a pound of high quality heroin at BUSTILLOS'

HOUSE, in addition to the other types of heroin that Bustillos did not sell to Puppet.  Moreover,

based on comments by both Puppet and Bustillos about Bustillos' history of selling types of

heroin, I believe Bustillos' possession and distribution of heroin was not aberrant behavior, but

rather a normal and frequent occurrence.  These conversations corroborate the investigation to

date, which suggests that Bustillos uses BUSTILLOS' HOUSE to regularly store and distribute

various qualities of bulk heroin.

## CONCLUSION

41.     Based upon the information provided in this affidavit, I believe the items, which are

described in Attachment B for each property to be searched (Attachment C), will constitute

admissible evidence of the violations outlined in this affidavit.

I swear that this information is true and correct to the best of my knowledge and belief.

JULIE A. OLMSTED
Special Agent
Drug Enforcement Administration


Subscribed and sworn to before me
This 7th day of December, 2015.

Steven C. Yarbrough
United States Magistrate Judge

18

## ATTACHMENT B

## Items To Be Seized

1. Any controlled substances enumerated in Title 21 United States Code (USC) § 812 for which possession without proper prescription, registration or authorization is illegal and in violation of § 841, except as authorized by Title 21 of the USC; including suspected heroin and methamphetamine;

2. Books, records, receipts, notes, ledgers, designated codes and other papers relating to the transportation, ordering, purchase and distribution of controlled substances;

3. Papers, tickets, notes, schedules, receipts, and other items relating to the SUBJECTS and others not yet identified and their co-conspirators;

4. In any medium, including electronic medium (such as cellular telephones), books, records, receipts, bank statements and records, financial statements, insurance records, loan applications and records, wills, real estate records, money drafts, letters of credit, money orders and cashier's checks, safe deposit box keys, records and agreements, and other documents evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining and/or secreting currency equivalents by the SUBJECTS, and other individuals and business entities acting on their behalf;

5. United States currency, precious metals, precious stones, jewelry, and financial instruments, including stocks and bonds;

6. Photographs and videos, in any medium, including electronic medium (such as cellular telephones), of the SUBJECTS, assets, and/or depicting unlawful controlled substances;

7. Notes, records, diaries, journals and papers referencing any interest the SUBJECTS may have in any business entities;

8. Records indicating occupancy, residency, and/or ownership, dominion and/or control, of the PREMISES by the SUBJECTS, and others including, but not limited to, utility, cable, and telephone bills, cancelled envelopes, and keys;

9. Firearms and ammunition; including but not limited to handguns, rifles, shotguns and automatic weapons;

10. Sales receipts for items evidencing the expenditure of currency and/or currency equivalents;

11. Paraphernalia for manufacturing, packaging, weighing, and distributing unlawful controlled substances, including but not limited to scales, plastic bags, plastic wrap, packing tape, electrical tape, duct tape, and vacuum-sealing equipment;

12. In any medium, including electronic medium (such as cellular telephones), documents, books and papers reflecting names, address books, addresses and/or telephone numbers pertaining to but not limited to the SUBJECTS listed above, as it relates to illegal narcotics trafficking or use of or dominion over the premises;

13. In any medium, including electronic medium (such as cellular telephones), books, records, receipts, notes, ledgers, invoices, bank records, diaries, purchase records, cash receipts and disbursements journals, inventory records and other records relating to the sales, repackaging, and redistribution of controlled substances;

14. In any medium, including electronic medium (such as cellular telephones), records, journals, promissory notes, receipts, and other documents reflecting loans and loan repayment by and between any Financial Institution and the SUBJECTS and entities listed above;  all of which are fruits, evidence and instruments of crimes against the United States Government;

15. In any medium, including electronic medium (such as cellular telephones), receipts, records, and documents depicting subscriber data and itemized telephone calls between SUBJECTS and other potential drug traffickers from the residential telephone and cellular telephones utilized or associated to the SUBJECTS, and others; including but not limited to telephone toll records for homes and/or business owned or controlled by the SUBJECTS and their associates or other telecommunications instruments used by them and/or their drug trafficking associates;

16. Any and all paging devices, cellular phones and other communication devices, bills or receipts relating to the leasing/renting of the paging devices and cellular telephones used or owned by the SUBJECTS and their associates;

17. In any medium, including electronic medium (such as cellular telephones), receipts, records, and documents indicating ownership, association, and utilization over any vehicles located at the place to be searched or elsewhere, including but not limited to titles, registration, gas receipts, repair bills and keys belong to that vehicle and/or SUBJECTS and others;

18. Other financial records which may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel by SUBJECTS and their associates; and

19. Any and all drug customer lists, dealers lists, or any notes containing the individual names of such persons, telephone numbers and/or addresses of these customers or dealers and any corresponding records of accounts receivable, money paid or received, drugs supplied or received, or cash received to pay for controlled substances or intended to pay for controlled substances.

## **ATTACHMENT C: Description of Properties and Photos**

224 Atrisco Vista SW #614, Albuquerque, New Mexico is a single-family dwelling constructed of wood frame and wood paneling exterior. Further, the domicile in question is a doublewide trailer-home. The home is brown in color and is trimmed in dark brown and white. The residence has a front door that faces east. There is a wood deck/landing leading to a white aluminum door. There are four steps leading to the wood deck landing on the north side of the deck. There is a second entrance to this residence on the south side. There are four wooden steps leading to a white aluminum door which has six small windows. The number "614" is black in color on a white background, posted on the dark brown trim on the northeast corner of the residence facing the street.



